IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEBRA K. BAKER**, ) | |
| ) | |
| Plaintiff, ) | 1:05cv96 |
| v. ) | |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

McLaughlin, Sean J., District J.,

In this case, Plaintiff Debra K. Baker seeks judicial review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*[1] Plaintiff filed the instant SSI application on December 16, 2002. After her claim was initially denied, Plaintiff sought and received a hearing before an Administrative Law Judge. In a decision dated July 6, 2004, the ALJ denied Plaintiff's application for benefits. This decision became the final decision of the Commissioner for appeal purposes after the Appeals Council declined to review the matter further.

Now pending before this Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner. For the reasons that follow, both motions will be denied and the matter will be remanded for further administrative proceedings.

---

[1] Plaintiff had a second appeal pending before this Court, which arose from the fact that she inadvertently took two judicial appeals from the same administrative decision. See Baker v. Barnhart, 1:04cv377 (W.D. Pa.). By order dated October 14, 2005, this Court granted Plaintiff's motion to consolidate the two appeals at the above-referenced docket number. However, on October 24, 2005 this Court granted Plaintiff's oral motion to de-consolidate the cases and dismiss the appeal pending at 1:04cv377.

1

## I.  BACKGROUND

Plaintiff was forty-six years old at the time of the ALJ's adverse decision in this case, making her a "younger person" under the Commissioner's regulations.  See 20 C.F.R. § 416.963.  She has a tenth grade education and no relevant prior work experience.  (R. 95, 100.)  Her last employment was in high school, when she briefly worked in a pizza shop.  (R. 156-57.)  She quit this job because she did not like being around people.  (R. 148.)  She and her husband of over 25 years live alone and have no children.

While Plaintiff originally alleged that she became disabled as of January 1, 1975, she later amended her alleged disability onset date to March 14, 2003.  Her medical records reflect a history of anxiety and depression, osteoarthritis, bursitis, and Meniere's Disease.

In March 2003 Plaintiff was consultatively examined by Kreig Spahn, D.O., at which time she presented as depressed.  She related a history of depression since school age when she was hospitalized for about 6 and ½ months due to malnutrition and thereafter placed in a series of foster homes.  Plaintiff informed Dr. Spahn that she could not sleep or get out of bed, she cries a lot, she does not do anything for pleasure, and she does not like to go out or be around people, preferring instead to be by herself.  She and her husband share in the housework.  They have no children because "she did not want to have the same thing happened [sic] to her children as what happened to her when she was growing up."  (R. 147-48.)  Though she reported a history of prior psychiatric treatment, she had recently decided to seek medication through her primary care physician.  (R. 146-48.)

In terms of physical problems, Plaintiff complained to Dr. Spahn of arthritis pain in most every area discussed but particularly in her lumbar region.  Dr. Spahn noted that an MRI of Plaintiff's lumbar region conducted in August of 2002 showed very mild

inferior degenerative changes. (R. 147, 138.) On physical examination, Plaintiff exhibited no radicular symptoms or sensory, motor or reflex changes and her active range of motion was thought to be inconsistent with grip strength. Her gait was somewhat antalgic on the left, and she could heel walk but not toe walk. (R. 149-50.) Dr. Spahn's assessment was: "1. Multiple aches and pains and subjective weakness with inconsistent findings on exam. 2. Depression." (R. 150.) He suspected that many of her problems were related more to depression than to any definite physical findings, but he felt that more testing would be needed to confirm this suspicion. Based on his examination, Dr. Spahn opined that Plaintiff has the physical capacity of meeting exertional demands at the sedentary-light level.

Plaintiff was consultatively examined by Michael Mercatoris, Ph.D., on March 14, 2003. Dr. Mercatoris noted Plaintiff's history of psychiatric treatment between the ages of 7 and 17, her hospitalization for malnutrition as a child, and her placement in foster homes until the age of 15. He felt that Plaintiff's subjective history was reasonably reliable.

Upon mental status exam, Plaintiff exhibited no unusual behavior or psychomotor activity and no unusual characteristics of speech. When asked about her mood, she responded that she had not wanted to get out of bed that morning. She reported depressive symptomatology, indicating, "A lot of times I cry for nothing. My husband will be talking to me and the next thing I know I'll be crying." (R. 157.) She reported difficulty sleeping but maintained a decent appetite. She denied suicidal thoughts but reported symptoms of panic attacks, stating: "It's like I can't breathe. Like I'm suffocating. Then I start shaking all over. Then I start crying. I'm scared to go out on the roads. ... I feel most safe at home." (Id.) Dr. Mercatoris' exam revealed no perceptual disturbances. Plaintiff's stream of thought was fluent and goal-directed. Her thought content was essentially normal, but she expressed fear of being taken away

from her husband, just as she had been taken away to foster homes as a child. (R. 158.) Her abstract thinking was only fair and Dr. Mercatoris thought she appeared to be of "low average to borderline" intellectual ability. Her concentration, orientation, and memory appeared to be intact. However, Dr. Mercatoris felt she had only fair social judgment and he noted that "her depression and panic disorder have a tendency to restrict her lifestyle." (R. 159.) Dr. Mercatoris noted that Plaintiff denied most of the criteria for major depression, recurrent, but she showed characteristics of panic disorder with agoraphobia. He wrote that she "may be of limited intellectual ability," and he assigned her a guarded prognosis. (R. 160.)

      Dr. Mercatoris also completed an assessment of Plaintiff's psychiatric abilities relative to: (1) carrying out activities of daily living, (2) functioning socially, (3) maintaining concentration and task persistence, and (4) adapting to stressful circumstances. With respect to activities of daily living, Dr. Mercatoris reported that Plaintiff can clean around the trailer and can cook. Her husband goes with her for shopping and pays the bills. She bathes daily and shows fair care for her dress, grooming and hygiene. Although she does not drive, Dr. Mercatoris felt she would probably be able to get around on a bus. In terms of social functioning, it was reported that Plaintiff gets along very well with her husband and has the ability to communicate clearly. She finds it hard to initiate social contacts and has no history of group activity participation. Her social maturity was thought to be "all right." Dr. Mercatoris felt she should be able to get along with authority figures, co-workers, peers, and the public. In terms of concentration and task persistence, Dr. Mercatoris noted that, when asked "whether she would be able to do [a] job such as a bagger in a grocery store and if she would be able to carry out instructions, work with[in] a schedule, complete [a] task from begging to end and sustain a routine," Plaintiff indicated, "No. Because of my hands. I can't lift anything heavy. My arm and hands feel numb. I have a hard time standing

4

cause my feet hurt constantly." (R. 160.) With respect to Plaintiff's ability to adapt to stressful circumstances, Dr. Mercatoris noted that Plaintiff does not like changes in her daily routine. She is slow to react with deadlines and schedules. She would respond to an argument with her husband by walking away and crying. Dr. Mercatoris felt she could make independent decisions, but he doubted that she would be able to maintain regular attendance in an employment context. (R. 161.)

Finally, Dr. Mercatoris completed a standard form in which he assessed Plaintiff's ability to do mental work-related activities. He indicated that she had a "good" ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, and understand, remember and carry out simple job instructions. (R. 162-63.) He rated Plaintiff "fair" in her abilities to follow work rules, deal with work stresses, function independently, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, relate predicably in social situations, demonstrate reliability, and understand, remember and carry out detailed (but not complex) job instructions. (Id.)

The record also includes an evaluation by a state agency expert, Sharon Becker Tarter, Ph.D., dated April 10, 2003. Dr. Becker Tarter opined that Plaintiff's mental impairments did not meet or equal any of those listed by the Commissioner as presumptively disabling. However, Dr. Becker Tarter felt that Plaintiff was impaired by major depressive disorder, limited intellectual functioning, and characteristics of panic disorder. (R. 167-69.) Dr. Becker Tarter opined that Plaintiff has "moderate" difficulties in her abilities to maintain social functioning and concentration, persistence and pace. She felt Plaintiff had only mild restrictions in her activities of daily living. (R. 174.) In her assessment of Plaintiff's mental residual functional capacity, Dr. Becker Tarter indicated that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a

normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, set realistic goals, and make plans independently of others.  In all other categories of functioning, Dr. Becker Tarter felt Plaintiff was not significantly limited.  In arriving at these conclusions, Dr. Becker Tarter wrote:

> The opinion stated within the DD-164 dated 3/14/03 provided by Dr. Michael Mercatoris, an examining source, has been considered. The psychologist's opinions are consistent with the residual functional capacity determined in this decision.  The examining source statements in the DD-164 concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments, making personal and social adjustments and other work related activities are well supported by the medical evidence and non-medical evidence in file.  Accordingly, the DD-164 submitted by Dr. Michael Mercatoris, dated 3/14/03, is given great weight and adopted in this assessment."

(R. 180.)

Plaintiff's primary care physician, Savita Joneja, M.D., provided an assessment of Plaintiff's ability to do work-related activities in July of 2003.  From a physical standpoint, Dr. Joneja felt Plaintiff's impairments did not affect her abilities to stand, walk or sit, provided that she gets rest breaks and provided also that some postural and environmental restrictions would apply.  (R. 197-99.)  Among other things, Dr. Joneja noted that Plaintiff's hearing was diminished in her right ear, her handling would be compromised by numbness in her finger tips, and back pain somewhat restricted her abilities to push and pull.  (<u>Id</u>.) From the standpoint of Plaintiff's mental capabilities, Dr. Joneja felt that Plaintiff had good ability to follow work rules and demonstrate reliability. She felt Plaintiff had only fair ability to use judgment, function independently, maintain attention and concentration, understand, remember and carry out simple job instructions, and maintain personal appearance.  She felt Plaintiff had poor or no ability

to interact with supervisors, coworkers or the public, deal with work stresses, understand, remember, and carry out detailed or complex job instructions, behave in an emotionally stable manner, or relate predictably in social situations. (R. 195-96.) Dr. Joneja reported that Plaintiff's depression hampers her abilities and she cannot tolerate stress. According to Dr. Joneja, Plaintiff gets very anxious with any little stress and starts crying. (R. 196.) In a November 2002 employability re-assessment form for the Pennsylvania department of public welfare, Dr. Joneja opined that Plaintiff is permanently disabled. (R. 214.)

Although not directly relevant to the period of disability alleged in this appeal, Dr. Joneja's progress notes indicate from a longitudinal perspective that Plaintiff has sought treatment for depression and anxiety, in addition to other conditions, since early 2001. (R. 329-330.) In February 2001 it was noted that Paxil was not providing Plaintiff much relief from her depression, so Dr. Joneja planned to take her off Paxil and start her on Prozac. (R. 329.) Dr. Joneja added Welbutrin to Plaintiff's regimen in April 2001 and noted the following month that Plaintiff was still depressed but handling it better on Welbutrin and Prozac. In August 2001, Dr. Joneja noted that Plaintiff was still depressed and cries easily. She opined that Plaintiff cannot work because she cannot handle her life or any problems. (R. 330.) Plaintiff was seen again in March of 2002, complaining that she was feeling more depressed and nervous. She cried very easily during the examination and reported that she had left a disability hearing due to nausea. (R. 220.) Progress notes from February 2003 indicate that Plaintiff was still feeling depressed and was scheduled to see a psychiatrist in Meadville. (R. 216.) Notes from June of 2003 indicate that Plaintiff was taking Welbutrin and Zoloft for her nerves "which are flared up." (Id.)

Plaintiff also has a history of Meniere's disease and resulting hearing loss, for which she has been treated by Marc Mazlov, M.D. Dr. Mazlov prescribed Dyazide for

Plaintiff's complaints of dizziness, and this reportedly resulted in a 30 percent improvement by October 2003.  On October 16, 2003, Dr. Mazlov noted that Plaintiff's Meniere's disease was now controlled, but he expressed concern about the possibility of a different form of dizziness such as benign positional vertigo.  Plaintiff underwent an ENG on October 29, 2003 with abnormal results possibly indicating a slight positional vertigo.  (R. 352.)   As of August 14, 2003, Plaintiff was complaining of a slight increase in spinning, tinnitus and nausea.  She reported experiencing some vertigo symptoms on a daily basis, sometimes for short durations and sometimes up to 2 or 3 hours.  A comparison of Plaintiff's audiogram taken that day with one taken three years prior showed a reduction of hearing sensitivity for pure tones for both left and right ears.  Nevertheless, Plaintiff declined to purchase a hearing aid because it would likely not be covered by insurance and Plaintiff was "not interested in initiating that financial commitment."  (R. 353.)  As of May 2004, Dr. Mazlov reported that Plaintiff was doing "extremely well" overall.  (R. 345.)  She was having fewer headaches and dizzy spells since starting Elavil, her hearing was subjectively stable, and her Meniere's Disease and vertigo were both controlled.  (Id.)

At the administrative hearing, Plaintiff testified about her symptoms, her medications, and her physical and mental limitations.  She described dropping out of school after tenth grade because she "just couldn't handle it," she "just sat and cried" and people were "getting to" her.  (R. 375.)  She presently takes Zoloft, Welbutrin, Phenobarb and Amitriptyline for her mental impairments and to help her sleep.  (R. 378.)  She takes Celebrex for her arthritis and bursitis and complains that her hands and arms go numb and sometimes her legs get weak.  (R. 379.)  Plaintiff feels that her condition is getting worse:  she cries very easily and does not feel safe when around other people.  (R. 380.)  She spends her time at home walking the floors, sitting down and then getting back up.  She will start something but never finishes what she starts.

(R. 381.)  Socially, she will go to her friend's house but then wants to come home because she does not feel comfortable or safe there.  She does not read.  She watches a little television but gets distracted easily.  (Id.)  She claims that she cannot manage even a sedentary job because she cannot handle being around a lot of people.  When others try to tell her what to do, she gets upset and then will sit and cry.  (R. 385.)  Plaintiff testified that, when her nerves bother her, she experiences chest pains, shakes all over, gets lightheaded and feels like she will vomit.  (R. 386.)  She states that she never has a day where she is free of her mental symptoms.  (R. 387.)  She has difficulty going places by herself and requires her husband's company because she has fears stemming from childhood of being taken away.  (R. 387-88.)

Following the close of evidence and the ALJ's adverse ruling, Plaintiff submitted a report by William J. Fernan, Ph.D., a licensed psychologist who examined her on December 7, 2004.  Throughout this examination, Plaintiff was reportedly extremely anxious, trembling, and constantly tearful.  (R. 361.)  Dr. Fernan administered a number of tests, including the Weschler Adult Intelligence Scale (WAIS)-III, the Wide Range Achievement Test-Revised, the Peabody Individual Achievement Test, and the Minnesota Multiphasic Personality Inventory-2.  As to the WAIS-III, Plaintiff earned a verbal IQ score of 67, a performance IQ score of 76, and a full scale IQ score of 69.  Dr. Fernan concluded that Plaintiff functions consistently in the mild range of mental retardation with no abilities in the average intelligence range.  His diagnosis was:  AXIS I:  Major Depressive Disorder, recurrent, severe, without psychotic features, Panic Disorder with agoraphobia, Generalized Anxiety Disorder; AXIS II:  Mild Mental Retardation; AXIS III:  Meniere's disease with hearing difficulties, tinnitus, vertigo and poor balance; allergies, high cholesterol, seizure disorder and arthritis with chronic, severe pain; AXIS IV:  Problems with primary support group, problems with the social

environment and occupational problems; AXIS V: GAF = 45 (current). (R. 364.) Dr. Fernan's prognosis was:

> Extremely poor, give the severity, long term nature, and limited response to treatment of her personal adjustment difficulties, combined with her many significant physical problems and her very limited level of cognitive functioning. Appropriate treatment would be seen as continued pharmacotherapy, but she would be seen as gaining minimal benefit with this treatment approach. She would be seen as most likely receiving no benefit from individual psychotherapy given her severely limited verbal skills, but she could possibly realize some mild improvement by participating in a partial hospitalization program.

(R. 365.) Dr. Fernan also completed a medical assessment of Plaintiff's mental ability to do work-related activities, similar to the ones completed by Dr. Mercatoris and Dr. Joneja. In this form, Dr. Fernan rated Plaintiff as having "good" ability to follow work rules and maintain personal appearance and "fair" ability to function independently. In all other twelve categories, he rated Plaintiff's abilities as "poor or none." (R. 367.)

## II. STANDARD OF REVIEW

This Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. See 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). See Richardson v. Parales, 402 U.S. 389, 401 (1971). Yet application of this standard is "not merely a quantitative exercise," and "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.1983). Moreover, evidence not substantial "if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion." Id.

10

## III.  DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration has established a five-step evaluation process to determine when an individual meets this definition:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work.  If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. The claimant bears the burden of proof for steps one, two, and four of this test.  The Commissioner bears the burden of proof for the last step.

Allen v. Barnhart, 417 F.3d 396, 401 n. 2 (3d Cir. 2005) (citations omitted).

In this case, the ALJ resolved the Plaintiff's claim at the fifth step.  At step one, he acknowledged that Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date.  At step two, he found that Plaintiff has impairments – namely, vertigo, hearing loss, depression, anxiety, and osteoarthritis (especially involving the lumbar spine) – that are "severe" within the meaning of the Act.  At step three, the ALJ found that Plaintiff's impairments do not meet or medically equal any listed impairment.  At step four, the ALJ acknowledged that Plaintiff has no relevant past work experience.  In connection with his analysis at step five, the ALJ determined

11

that Plaintiff's subjective complaints were not fully credible and that she retains the residual functional capacity (RFC) to perform:

> sedentary work which would allow her to sit or stand at her discretion and would allow for occasional postural movements. The claimant should avoid jobs involving good hearing, and she would not be able to perform work involving more than simple, short instructions, she should avoid close interaction with coworkers, work setting changes, more than simple, routine, repetitive tasks with one or two step instructions, decision-making, dealing with the public, and exposure to heights, dangerous machinery, driving , dust, fumes, chemicals, temperature extremes, and vibration.

(R. 28, finding 6.) Based on this RFC assessment, the ALJ found that the Plaintiff retains the residual functional capacity to perform other work in the national economy, including work as a packager and small parts assembler. Accordingly, the ALJ determined that Plaintiff is not "disabled" within the meaning of the Social Security Act.

Plaintiff poses a laundry list of challenges to the ALJ's analysis at steps three and five of the disability evaluation process, which can be summarized as follows: (1) the ALJ erred in his analysis at step three by failing to consider whether Plaintiff's mental impairment met or equaled the requirements for Mental Retardation under Listing 12.05; (2) the ALJ erred at step three with respect to his analysis of Plaintiff's abilities to carry out activities of daily living, to function socially, and to maintain concentration, persistence, and pace, and in further finding that there is no evidence of episodes of deterioration and decompensation; (3) the ALJ erred in his assessment of Plaintiff's credibility; (4) the ALJ mischaracterized the evidence regarding Plaintiff's vestibular impairment and/or Meniere's disease; (5) the ALJ improperly rejected Dr. Joneja's assessment of Plaintiff's mental impairments; (6) the ALJ erred in his evaluation of Dr. Mercatoris' consultative opinion; (7) the ALJ erred in concluding that his RFC assessment was consistent with the opinions of the state agency medical consultants; (8) the ALJ's hypothetical did not encompass all of Plaintiff's relevant

limitations; (9) there is new evidence concerning Plaintiff's limited intellectual ability that should be considered under Matthews v. Apfel, 239 F.3d 589 (3d Cir. 2001).

We agree with the Plaintiff that the ALJ committed legal error with respect to his treatment of Dr. Mercatoris' consultative opinion. In his detailed report, Dr. Mercatoris wrote, among other things, that he doubted Plaintiff would be able to maintain regular attendance if she found employment. The ALJ rejected this particular limitation, explaining that "[Dr. Mercatoris'] overall psychological examination appears inconsistent with that assessment, as he reported that the claimant had no impairment of thought processes, memory, concentration, or communication skills." (R. 25.) Initially, we note that it is not entirely accurate to represent that Dr. Mercatoris found "no impairment" with regard to Plaintiff's thought processes. Dr. Mercatoris' report indicates that he considered several subcategories of functioning under the general rubric of "thought processes" and, while he reported no major deficiencies in Plaintiff's stream of thought, thought content and concentration, Dr. Mercatoris observed that Plaintiff's abstract thinking was only fair and her intelligence level appeared to be low average to borderline. (R. 158-59.) More to the point, however, the categories of functioning which the ALJ cited as "unimpaired" do not necessarily relate to the Plaintiff's ability to maintain regular attendance at a job and, therefore, they do not in any logical fashion undermine Dr. Mercatoris' professed concern about attendance.

The ALJ referred also to Dr. Mercatoris' medical source statement, in which Plaintiff was rated "fair" or "good" in virtually all areas of psychiatric functioning. Upon closer scrutiny, however, this evidence similarly fails to support the ALJ's reasons for discounting Dr. Mercatoris' opinion. It is true that Dr. Mercatoris rated Plaintiff as having "good" ability in five different categories – including her ability to use judgment, execute simple job instructions, and interact appropriately with co-workers, supervisors, and the public – and we see no problem insofar as the ALJ relied on these particular

13

findings.  However, the ALJ also relied on the fact that Plaintiff was rated "fair" in nine categories, including her ability to follow work rules, deal with work stresses, function independently, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  The administrative record does not include the entire form on which Dr. Mercatoris provided his medical source statement and, consequently, no information is provided to us defining or explaining the examiner's use of the term "fair."  The ALJ apparently interpreted the numerous "fair" ratings as indicating adequate functional ability for purposes of sustained employment.  He did not dispute the "fair" ratings and concluded that his residual functional capacity assessment adequately accounted for "any possible nonexertional limitations."  (R. 25.)  Plaintiff, on the other hand, submits that a rating of "fair" indicates "serious limitation."  This ambiguity cannot be resolved on the present record, but considering the fact that "residual functional capacity" refers to the *most* that a claimant can do on a *regular and continuing* basis despite any relevant physical or mental limitations, see 20 C.F.R. 416.945(a)(1) and (c), it is not at all clear that Dr. Mercatoris' ratings of a "fair" functional ability in numerous domains supports the ALJ's RFC determination.  In short, on this record, the ALJ's evaluation of Dr. Mercatoris' opinion is unsupportable because it appears to be based purely on personal inferences and speculation.

This problem is exacerbated by the ALJ's reliance on the opinion of the state agency expert, Dr. Becker Tarter, in support of his RFC determination.  Dr. Becker Tarter completed a mental residual functional capacity assessment in which she rated Plaintiff as "not significantly limited" in several categories and only "moderately" limited in her ability to:

- carry out detailed instructions,
- maintain attention and concentration for extended periods of time,

- complete a normal workday/workweek without interruption from psychologically based symptoms,

- get along with coworkers or peers without distracting them or exhibiting behavioral extremes,

- respond appropriately to changes in the work setting, and

- set realistic goals ro make plans independently of others.

(R. 179.) Plaintiff objects that the ALJ failed to discuss, quantify or incorporate into his hypothetical the "moderate" limitations identified by Dr. Becker Tarter.  Thus, Plaintiff submits that the ALJ was inaccurate in representing that his RFC assessment was consistent with the opinions of the state agency consultants.

We agree that the ALJ's reliance on Dr. Becker Tarter's opinion is problematic, but for a different reason.  In opining on Plaintiff's work-related abilities, Dr. Becker Tarter specifically relied upon and adopted Dr. Mercatoris' medical source statement which she opined is "well supported" by the medical and non-medical evidence.  (R. 180.)  No mention is made, however, of Dr. Mercatoris' clinical evaluation report or the limitations noted therein, most notably, his professed doubt that Plaintiff could maintain regular attendance in a work setting.  It is therefore unclear whether Dr. Becker Tarter was even aware of this particular limitation.  (See SSR 96-6p 1996 WL 374180 (July 2, 1996) (opinions of state agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering such factors as, among other things, consistency of the opinion with the record as a whole)).  Since Dr. Becker Tarter opined that Plaintiff's mental limitations did not preclude her from working, Dr. Becker Tarter, like the ALJ, appears to have interpreted Dr. Mercatoris' ratings of "fair" ability to indicate adequate functional ability on a sustained basis.  Because the record lacks any basis for this interpretation, as opposed to, e.g., an interpretation that "fair" indicates inadequate functional ability or adequate functional ability only on an intermittent basis,

Dr. Becker Tarter's opinion does not constitute substantial evidence in support of the ALJ's RFC determination.

In sum, the ALJ's assessment of Plaintiff's residual functional capacity is not supported by substantial evidence because neither the ALJ nor the state agency expert on whom he relies adequately accounted for Dr. Mercatoris' concern that Plaintiff cannot maintain regular work attendance. And, because that potentially relevant limitation is not included in the ALJ's hypothetical question to the vocational expert, we cannot say that the ALJ's decision to deny benefits is supported by substantial evidence. See Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) ("If ... an ALJ poses a hypothetical question to a vocational expert that fails to reflect 'all of the claimant's impairments that are supported by the record(,) ... it cannot be considered substantial evidence.'") (quoting Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

We have found that the ALJ's rejection of Dr. Mercatoris' opinion, based on personal inferences and speculation as to an unresolved ambiguity in the record, cannot stand. On remand, the Commissioner should attempt to supplement the record relative to Dr. Mercatoris' ratings on his medical source statement, in particular, the meaning of the term "fair" as it is used by him. The Commissioner should then reassess Dr. Mercatoris' opinion as to Plaintiff's ability to maintain regular job attendance with the benefit of this ambiguity having been resolved.

Two additional challenges raised by Plaintiff merit some comment. First, Plaintiff contends that the ALJ erred in failing to conduct any analysis at step three of the disability evaluation process as to whether Plaintiff met or equaled the requirements for mental retardation set forth at 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05. Second, Plaintiff contends that new and material evidence exists, in the form of Dr. Fernan's December 2004 consultative opinion, which is relevant to a determination under

16

§ 12.05. Plaintiff seeks to have this evidence considered under the mandates of Matthews v. Apfel, 239 F.3d 589 (3d Cir. 2001).

Matthews holds that, when a claimant seeking judicial review of the Commissioner's final decision seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner "but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." 239 F.3d at 593. The court of appeals explained the "sound public policy" underlying this rule:

> We should encourage disability claimants to present to the ALJ all relevant evidence concerning the claimant's impairments. If we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand. .... Instead, we believe that it is a much sounder policy to require claimants to present all material evidence to the ALJ and prohibit judicial review of new evidence unless there is good reason for not having brought it before the ALJ. Such a holding is instrumental to the speedy and orderly disposition of Social Security claims.

Id. at 595 (internal citations omitted).

Here, Plaintiff contends that Dr. Fernan's report is both new and material evidence "because it speaks to mental retardation, Listing 12.05, a listing identified as a category upon which the state agency psychologist conducted their medical disposition (Tr. 164), but never analyzed or mentioned by the ALJ." (Pl.'s Br. [Doc. 7] at 19.) Plaintiff insists that there is good cause for her previous failure to submit the report inasmuch as the evidence did not exist prior to the ALJ's decision.

We do not agree that a showing of "good cause" can be made here for Matthews purposes. As of March 2003, Plaintiff was on notice of Dr. Mercatoris' observation that she appeared to have "low average to borderline" intellectual ability. There is nothing of record to suggest that she would have been unable to obtain a consultative examination by Dr. Fernan prior to the ALJ's decision, thus allowing the ALJ to consider the evidence in a timely fashion. Nor is this a situation where Plaintiff's intellectual abilities

17

are likely to have changed significantly over time; presumably, if Dr. Fernan would have conducted his intelligence testing prior to July 2004, when the ALJ rendered his decision, Plaintiff would have produced comparable scores. Claimants who delay the procurement of relevant medical evidence until after the ALJ's decision is rendered will always, perforce, be able to assert that the evidence did not previously exist simply by virtue of the fact that it was not sought. If this could satisfy Matthew's "good cause" standard, the policy interests outlined in that case would be subverted.

Nevertheless, while we do not believe that consideration of Dr. Fernan's report is compelled under Matthews, this conclusion does not render Dr. Fernan's report wholly irrelevant. It is well established in this circuit that an ALJ has a duty to develop the record adequately, even where the claimant is represented by counsel. See Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Boone v Barnhart, 353 F.3d 203, 208 n.11 (3d Cir. 2004) (citing other cases). In this case, as we have noted, Dr. Mercatoris opined that Plaintiff appeared to have only limited – and possibly borderline – intelligence. Dr. Becker Tarter similarly found that the Plaintiff is impaired by limited intellectual ability, but she determined that Plaintiff did not meet or equal the requirements for listing 12.05, pertaining to mental retardation. The ALJ never addressed the issue at all in his step three analysis, contrary to the mandates of 20 C.F.R. § 416.920a, which require the ALJ to evaluate mental impairments by using the prescribed psychiatric review technique. One of the Administration's stated reasons for employing this technique is to "[i]dentify the need for additional evidence to determine impairment severity." Id. at § 916.920a(a)(1). As this matter is already being remanded to the Commissioner for further administrative proceedings, the ALJ should further develop the record, consistent with his duties, by exploring the extent of Plaintiff's impaired intelligence and the degree to which it impairs her ability to maintain substantial gainful employment. We will leave it to the ALJ's discretion whether and to

18

what extent he accepts Dr. Fernan's report. However, on remand, the ALJ should analyze Plaintiff's limited intellectual abilities with specific reference to whether she meets or equals the requirements of Listing 12.05, particularly §12.05(C).

Plaintiff also contends that the ALJ committed reversible error in failing to properly credit her own testimony, in failing to accord appropriate weight to the opinion of her treating physician, and in failing to credit (at step three of the evaluation process) her limitations relative to activities of daily living, social functioning, concentration, persistence, and pace, and episodes of deterioration and decompensation. Because it is conceivable that the ALJ's assessments in these areas might be affected on remand by reconsideration of Dr. Mercatoris' opinion and evidence as to Plaintiff's intellectual functioning, we need not address these challenges at present. Instead, we will leave it to the Commissioner to address these issues in the first instance on remand. We have considered Plaintiff's remaining challenges to the Commissioner's decision but we find them to be without merit and immaterial to reconsideration of Plaintiff's claim on remand.

## IV.  CONCLUSION

Based upon the foregoing reasons, we will vacate the Commissioner's final decision in this matter and remand the case for further administrative proceedings consistent with this Memorandum Opinion. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEBRA K. BAKER**, ) | |
| ) | |
| Plaintiff, ) | 1:05cv96 |
| v. ) | |
| ) | |
| **JO ANNE B. BARNHART**, ) | |
| **Commissioner of Social Security**, ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

AND NOW, to wit, this 28th day of October, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's motion [Doc. 6] for summary judgment is DENIED, the Commissioner's motion [Doc. 8] for summary judgment is DENIED, and the above-captioned case is REMANDED to the Commissioner for further administrative proceedings consistent with this Memorandum Opinion and Order.

                                                                      s/    Sean J. McLaughlin
                                                                        United States District Judge

cm:   All counsel of record.